UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| JOHN T. CLORE, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | |
| v. | ) ) | CAUSE NO. 1:17-cv-00026-SLC |
| COMMISSIONER OF SOCIAL SECURITY, *sued as Nancy A. Berryhill,*[1] *Acting Commissioner of SSA,* | ) ) ) ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff John T. Clore appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for disability insurance benefits ("DIB").[2] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

### I. FACTUAL AND PROCEDURAL HISTORY

Clore applied for DIB in April 2014, alleging disability as of November 5, 2013. (DE 9 Administrative Record ("AR") 205-06). The Commissioner denied Clore's application initially and upon reconsideration. (AR 136-39, 146-52). After a timely request, a hearing was held on March 9, 2016, before Administrative Law Judge Stephanie Katich (the "ALJ"), at which Clore, who was represented by counsel; Clore's mother; and a vocational expert, Sharon Ringenberg

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 12); *see* 28 U.S.C. § 636(c).

(the "VE"), testified. (AR 56-109). On June 6, 2016, the ALJ rendered an unfavorable decision to Clore, concluding that he was not disabled because he could perform a significant number of unskilled, sedentary jobs in the economy despite the limitations caused by his impairments. (AR 19-45). Clore requested review of the decision by the Appeals Council and submitted additional evidence with that request, but the Appeals Council denied review (AR 1-6), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Clore filed a complaint with this Court on January 23, 2017, seeking relief from the Commissioner's decision. (DE 1). Clore advances four arguments in this appeal: (1) that the ALJ failed to properly evaluate the medical source opinions and adopted a flawed residual functional capacity ("RFC") finding; (2) the RFC assigned by the ALJ does not account for all of Clore's mental limitations, including his moderate deficits in maintaining concentration, persistence, or pace; (3) that the ALJ's step-five finding is not supported by substantial evidence because the VE failed to provide an adequate foundation for the number of jobs cited; and (4) that the Appeals Council erred in its consideration of the additional evidence that Clore submitted. (DE 17 at 10-24).

At the time of the ALJ's decision, Clore was 30 years old (AR 45, 205) and had obtained a high school degree and an associate's degree, had gone to diesel mechanic school, and had received on-the-job training from Navistar Truck and Engine (AR 73, 244). Clore had worked as a part picker, field service engineer, gas station attendant, and mechanic. (AR 245, 339). In his DIB application, Clore alleged disability due to post traumatic stress disorder ("PTSD"), deep vein thrombosis, pulmonary embolism, hypertension, depression, lower back problems, left shoulder problems, gastrointestinal pain and nausea, and diarrhea. (AR 243). Clore was six, feet

four inches tall and weighed 403 pounds at the time he applied for disability. (AR 243).

Clore has been hospitalized at least four times (May 2011, December 2012, February 2013, and November 2013) due to his history of deep vein thrombosis with recurrent pulmonary emboli. (AR 381-82, 501-03, 708-19, 1053). In addition to his primary care physician, Clore has consulted or been treated by multiple specialist physicians for his various impairments, including a hematologist, a pain management specialist, an orthopaedist, a pulmonologist, a gastroenterologist, and a psychiatrist.

## II. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence,

reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### III. ANALYSIS

#### *A. The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

(citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On June 9, 2016, the ALJ issued a decision that ultimately became the Commissioner's final decision. (AR 19-45). At step one, the ALJ concluded that Clore had not engaged in substantial gainful activity after his alleged onset date. (AR 21). At step two, the ALJ found that Clore had the following severe impairments: hypercoagulability resulting in pulmonary embolism, chronic pain syndrome, obesity, degenerative disc disease of the lumbar spine, PTSD, and a major depressive disorder. (AR 22). At step three, the ALJ concluded that Clore did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 23-26). Before proceeding to step four, the ALJ determined that Clore's symptom testimony was "not entirely credible" and then assigned Clore the following RFC:

> [T]he claimant has the physical [RFC] to perform the full range of sedentary work . . . except that he cannot climb ladders, ropes, or scaffolds or engage in other postural changes on a constant or frequent basis, but is able to climb ramps and stairs, balance, stoop, kneel, crouch and crawl on an occasional basis. With respect to his work environment, he must avoid all exposure to unprotected heights, slippery, uneven surfaces, and dangerous machinery. The claimant retains the mental [RFC] to understand, remember, and carry out simple tasks and instructions, make judgments on simple work-related decisions, and respond appropriately to usual work situations that are free of fast-paced production requirements. As to social interactions, he can tolerate occasional interactions with co-workers, supervisors, and the general-public.

(AR 26). The ALJ found at step four that Clore was unable to perform any of his past relevant

work. (AR 42). At step five, based on the assigned RFC and the VE's testimony, the ALJ concluded that Clore could perform a significant number of unskilled, sedentary jobs in the economy, including eyeglass frames polisher, tube operator/mail clerk, and addresser. (AR 44). Therefore, Clore's application for DIB was denied. (AR 45).

## C. The Assigned RFC

Clore argues, among other things, that the RFC assigned by the ALJ is not supported by substantial evidence. More particularly, Clore faults the ALJ for failing to properly evaluate the evidence from Dr. Gary Gize and Dr. Hary Ailinani, his treating specialists, concerning his inability to sit for extended periods, his need to shift positions frequently, his need to elevate his legs above his heart, his expected absenteeism, and his need for a bariatric chair. For the following reasons, Clore's arguments are persuasive, at least in part.

The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning eight hours a day, for five days a week. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). That is, the "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." SSR 96-p, 1996 WL 374284 ,at *1; *see* 20 C.F.R. § 404.1545(a)(1) ("Your [RFC] is the most you can still do despite your limitations."); *see also Young v. Barnhart*, 362 F.3d 995, 1000-02 (7th Cir. 2004) (citations omitted). The RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p,

6

1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. § 404.1545.  Therefore, when determining the RFC, the ALJ must consider all medically determinable impairments, mental and physical, even those that are non-severe.  20 C.F.R. § 404.1545(a)(2); *see also Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances."  *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. § 404.1527(c)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."[4]  *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002) (citing 20 C.F.R. § 404.1527(c)(2)).  The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion.  *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(c)(2).

   1. Dr. Gize

Clore saw Dr. Gize, his treating hematologist, on a monthly basis from February 2013 to January 2016, amounting to about 45 visits, to monitor his anti-coagulation therapy.  (AR 795-834, 942-57, 1388-1435, 1699-1761, 1815-37).  Between November 2013 and December 2015, Clore's weight increased from 404 pounds to 462 pounds.  (AR 710, 1708).  In May 2015, Dr.

---

[4] In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.  *See Books*, 91 F.3d at 979; 20 C.F.R. § 404.1527(c).

7

Gize completed a medical source statement, opining, among other limitations, that Clore could sit for less than two hours in an eight-hour workday; must be able to shift positions at will from sitting, standing, or walking; must walk for 10 minutes every hour; requires several unscheduled breaks during a workday; must elevate his legs above his heart for one to two hours in a workday; and would likely be absent from work about three days per month due to his impairments. (AR 1444-47, 1769-72).

The ALJ discussed quite extensively the treatment records and medical source statement provided by Dr. Gize (AR 36-37), but ultimately assigned "little" weight to the limitations in the medical source statement, characterizing them as "extreme" (AR 35). The ALJ viewed Dr. Gize's medical source statement as inconsistent with his own treatment records, as well as inconsistent with records from other sources of record. (AR 36).

The ALJ explained that he found the limitations in Dr. Gize's medical source statement inconsistent with Dr. Gize's assessment of Clore's "ECOG" performance status documented in the treatment records. (AR 36 (citing AR 793-848)). The ECOG Scale of Performance Status was developed by the Eastern Cooperative Oncology Group and describes a patient's level of functioning in terms of his ability to care for himself, daily activity, and physical ability. *See* https://ecog-acrin.org/resources/eocgo-performance-status (last visited May 11, 2018). In December 2013, Dr. Gize rated Clore as "ECOG 2" (AR 824), which means "[a]mbulatory and capable of all selfcare but unable to carry out any work activities; up and about more than 50% of waking hours." *Id*. The ALJ considered, however, that this rating was given just one month after Clore was hospitalized with a blood clot in November 2013. (AR 36).

The ALJ then seized the fact that in January 2014, Clore asked Dr. Gize if he was in good

8

enough medical condition to ride a bus to a convention in Wisconsin, and Dr. Gize advised that there was indeed risk but that if Clore went, "he should get up and walk frequently." (AR 36 (citing AR 817)). The ALJ viewed Dr. Gize's response as evidence that Clore's condition was improving. (AR 36). The ALJ then considered that in February 2014, Dr. Gize changed Clore's ECOG performance status to "ECOG 1" (AR 36 (citing AR 812)), which means "[r]estricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature, e.g., light house work, office work." *See* https://ecog-acrin.org/resources/eocgo-performance-status (last visited May 11, 2018). The ALJ observed that Clore's ECOG performance status remained the same thereafter through September 2014. (AR 36).

As additional evidence of Clore's improvement, the ALJ pointed to Dr. Gize's treatment notes from December 2014 to June 2015 that indicated Clore was clinically stable and doing relatively well overall, but that his morbid obesity was still a big issue. (AR 36 (citing AR 1388-1426, 1756-66)). Records from July 2015 through January 2016 reveal that Clore complained of chronic joint and leg pain and some shortness of breath, and examinations showed mild swelling in his right arm and lower extremities. (AR 1698-1714, 1731-60). However, Clore generally demonstrated normal gait, station, and range of motion. (AR 1698- 1714, 1731-60). The records reflect that Clore understood he was going to have chronic aches and pains associated with his hypercoagulable state, recurrent pulmonary embolism, and morbid obesity, but that he had to try to become more active. (AR 1699, 1711).

Ultimately, the ALJ viewed Dr. Gize's treatment records as inconsistent with a finding that Clore was incapable of sedentary work activities, and therefore, the ALJ assigned the limitations in Dr. Gize's medical source statement "little weight." (AR 37). The ALJ's

9

reasoning, however, is flawed, at least in part, because some of the limitations in Dr. Gize's medical source statement are indeed consistent with his treatment records and the records of other physicians. Particularly, Dr. Gize's limitation that Clore should shift positions at will from sitting, standing, or walking; elevate his legs above his heart intermittently; and walk for some minutes every hour are consistent with Dr. Gize's treatment records. Dr. Gize frequently documented mild swelling in Clore's lower extremities, and he emphasized to Clore that he should try to become more active due to his hypercoagulable state, recurrent pulmonary embolism, and morbid obesity. And when Clore asked whether he could travel by bus to a convention, Dr. Gize responded that it could be a risk, but if Clore went, he "should get up and walk frequently." (AR 36 (citing AR 817)). Nor is Dr. Gize's rating of Clore as "ECOG 1" in his treatment notes necessarily inconsistent with a need to shift positions at will from sitting, standing, or walking; elevate his legs above his heart intermittently; and walk some minutes every hour due to a combination of his impairments. As such, the ALJ's wholesale rejection of *all* of the limitations opined by Dr. Gize in the medical source statements is not supported by substantial evidence. Rather, it is quite clear that Dr. Gize considered prolonged sitting to be a risk for Clore based on the combination of his medical impairments, and this concern is not inconsistent with other evidence in the record. (*See, e.g.*, AR 714-17, 1862).

Having said that, the RFC assigned by the ALJ is not without some support in the record. Dr. Mangala Hasanadka and Dr. M. Brill, the state agency physicians, reviewed Clore's record and concluded that he could perform sedentary work, and the ALJ, in turn, assigned "significant" weight to these two opinions. (AR 37-38). But these state agency physicians reviewed the record and rendered their opinions in May and October 2014, respectively (AR 117, 131), *before*

10

Dr. Gize issued his medical source statement in May 2015 (AR 1444-47, 1769-72). Thus, the state agency doctors never reviewed Dr. Gize's opinion concerning Clore's need to shift positions at will from sitting, standing, or walking; elevate his legs above his heart intermittently; and walk some minutes every hour. Dr. Gize's opinions reasonably could have impacted the state agency doctors' opinions. *See Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016) ("Before basing a denial on such a finding, the ALJ should have considered contrary evidence and obtained a medical opinion based on a complete record." (citation omitted)).

Accordingly, the Court concludes that the ALJ's wholesale rejection of all of the limitations in Dr. Gize's medical source statement is not supported by substantial evidence. The case will be remanded for reconsideration of the RFC and the limitations in Dr. Gize's medical statement—in particular, that Clore should shift positions at will from sitting, standing, or walking; elevate his legs above his heart intermittently; and walk for some minutes every hour.

2. Dr. Ailinani

Clore saw Dr. Ailinani, a pain management specialist, for about 14 visits between March 2014 and January 2016. (AR 881-88, 1566-1640, 1628-40). In February 2016, Dr. Ailinani completed a medical source statement, opining, among other limitations, that Clore needed to frequently change positions; could sit less than two hours in an eight-hour workday; must be able to shift positions at will from sitting, standing, or walking; must walk every 15 minutes for 10 minutes; must take frequent unscheduled breaks during a workday; must elevate his legs 20 percent of the workday; and would likely be absent from work more than four days per month. (AR 1804-07). Additionally in April 2016, Dr. Ailinani opined that Clore would require a bariatric chair to perform work in a seated position due to his morbid obesity, and that he could

not remain in a seated position for two-hour intervals and six hours total in an eight-hour workday due to his history of chronic deep vein thrombosis and lumbar pain. (AR 1862).

As with Dr. Gize's opinion, the ALJ discussed Dr. Ailinani's treatment records and medical source statement quite extensively, but ultimately assigned "little" weight to the limitations in the medical source statement, characterizing them as "extreme." (AR 35). The ALJ viewed the medical source statement as inconsistent with Dr. Ailinani's own treatment records, as well as records from other sources. (AR 36).

In discounting the limitations articulated in Dr. Ailinani's medical source statement, the ALJ highlighted that although Dr. Ailinani's exams revealed thoracic and lumbar tenderness and some spasms, Clore consistently demonstrated a stable gait and normal strength. (AR 34 (citing 987-88, 994-95, 1027-28, 1567-58, 1576-77, 1581-82, 1590-91, 1596-97, 1616-17, 1621-22, 1629-30)). The ALJ also considered that Dr. Ailinani documented that Clore was stable on his medications in August 2015, that Clore was attempting aqua therapy in his neighbor's pool, and that in January 2016 Dr. Ailinani advised Clore to start yoga and physical therapy. (AR 35 (citing AR 1570, 1579, 1599, 1604)). Ultimately, the ALJ viewed Dr. Ailinani's treatment records as inconsistent with the limitations in his medical source statement, and thus, assigned the limitations "little weight." (AR 37).

However, as with Dr. Gize's limitations, the ALJ's reasoning for discounting Dr. Ailinani's limitations is flawed, at least in part, because some of the limitations in Dr. Ailinani's medical source statement are consistent with his treatment records and the records of other physicians. Specifically, Dr. Ailinani's limitation that Clore should shift positions at will from sitting, standing, or walking; elevate his legs intermittently; and walk for some minutes every

12

hour are consistent with Dr. Ailinani's treatment records. (AR 1804-07); *see, e.g.*, *Lanzi-Bland v. Berryhill*, No. 16 C 8856, 2017 WL 4797529, at *4 (N.D. Ill. Oct. 24, 2017) (remanding case where the ALJ seized upon the doctor's documentation indicating that the claimant consistently presented with normal gait and strength, yet the ALJ offered no discussion as to how these findings were inconsistent with the doctor's conclusions about the claimant's work abilities and limitations).

Furthermore, the ALJ's rejection of Dr. Ailinani's opinion that Clore requires a bariatric chair to perform work in a seated position is not adequately supported. The ALJ rejected this opinion for two reasons: (1) because the ALJ viewed the need for a bariatric chair as inconsistent with Dr. Ailinani's recommendation that Clore participate in aqua therapy, yoga, and physical therapy; and (2) because no other treating source opined that Clore needed such a device and Dr. Ailinani did so only after Clore's attorney inquired whether he would need a bariatric chair. (AR 35). But in doing so, the ALJ inappropriately "played doctor" by finding that a bariatric chair was somehow inconsistent with the activities that Dr. Ailinani encouraged Clore to participate in. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." (citations omitted)). And that Dr. Ailinani was the only treating source to recommend a bariatric chair or that he provided the opinion in response to a question from counsel does not automatically mean the chair was unnecessary. *See Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998) ("[T]he mere fact that a medical report is provided at the request of counsel or, more broadly, the purpose for which an opinion is provided, is not a legitimate basis for evaluating the reliability of the report."); *see also Moss v. Astrue*, 555 F.3d 556, 560-61 (7th Cir. 2009)

13

(citation omitted).

Moreover, as already discussed above, Drs. Hasanadka and Brill, the state agency physicians, reviewed the record and rendered their opinions in May and October 2014, respectively (AR 117, 131), *before* Dr. Ailinani issued his medical source statement in February 2016 and the supplemental statement two months later (AR 1804-07). Thus, the state agency doctors never reviewed Dr. Ailinani's opinion concerning Clore's need to shift positions at will from sitting, standing, or walking; elevate his legs intermittently; walk some minutes every hour; and use a bariatric chair. Dr. Ailinani's opinion reasonably could have impacted the state agency doctors' opinions. *See Stage*, 812 F.3d at 1126.

Accordingly, the Court concludes that the ALJ's wholesale rejection of all of the limitations in Dr. Ailinani's medical source statement and supplemental statement is not supported by substantial evidence. Therefore, the case will be remanded for further consideration of the RFC and the limitations in the medical source statements of Clore's treating specialists, Dr. Gize and Dr. Ailinani—in particular, that Clore should shift positions at will from sitting, standing, or walking; elevate his legs above his heart intermittently; walk for some minutes every hour; and use a bariatric chair.[5]

## IV. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Clore and against the

---

[5] Because a remand is warranted on this basis, the Court need not reach the remainder of Clore's arguments.

Commissioner.

SO ORDERED.

Entered this 30th day of May 2018.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge